JOSEPH COYNE, Plaintiff, *v.* CHATHAM PHENIX NATIONAL BANK
AND TRUST COMPANY and Others, Defendants.

City Court of New York, Kings County, May 22, 1935.

*Thomas O'Rourke Gallagher,* for the plaintiff.

*Chadbourne, Stanchfield & Levy,* for the defendant, Chatham
Phenix National Bank and Trust Company.

GOLDSTEIN, J.   This is an action to recover moneys paid under
an alleged subscription agreement for stock of the Chatham Phenix
National Bank and Trust Company.   The plaintiff was an employee
of that bank.   The case has been submitted to this court upon an
agreed statement of facts.   From that statement it appears that
during the days of frenzied finance in August, 1929, the officers and
directors of this bank were, apparently, very much interested in

increasing the sale of the stock of the bank and " generously offered " the stock to their employees. There was circulated amongst the employees of the bank a typewritten two-page paper headed " Employees Stock Offering " which read as follows:

" EMPLOYEES STOCK OFFERING.

" President L. G. Kaufman and our director, Mr. E. P. Earle, have very generously offered to officers and employees 2,000 shares of Chatham Phenix stock with valuable rights to subscribe to the new stock attached, at $772. The present market is $860–$865.

" The Management Committee has arranged a loan to carry this stock and also another loan to take up the rights accruing to the stock on October 4, and is therefore in a position to offer the new stock to the officers and employees rather than the old, with rights attached. Instead of there being 2,000 shares of old stock at $772, with rights attached, there will be 12,000 shares of the new stock at $144.

" The bank, beginning October 1, will start paying dividends at the rate of four dollars per annum per share on the new stock. This figure of $144 is most attractive and all of the officers and employees of the bank are deeply indebted to Mr. Kaufman and Mr. Earle for making the stock available at such a low figure.

" The offering is made under the following conditions:

" 1. The offer is open only to officers and employees of Chatham Phenix National Bank and Trust Company and Chatham Phenix Corporation.

" 2. Payments are to be made at the rate of $1.50 per share each pay day ($3 per month) for a period of four years. In other words, ninety-six payments of $1.50 for each share subscribed.

" 3. This amount is to be deducted by the pay department in making up the semi-monthly pay-roll. The first deduction will be made on the September 15th pay date.

" 4. The stock subscribed for cannot be sold until the expiration of four years, namely, September 1, 1933, even though paid for in full prior to that date.

" 5. No stock (even though paid for at an earlier date) will be delivered to the purchaser until September 1, 1933, except by special permission of the Management Committee.

" 6. Interest on the loan carrying the stock will be charged at cost to the purchaser and will be figured on an annual basis. Dividends on the stock will be credited to the purchaser. The difference between the interest and the dividends will be credited or charged, as the case may be, to the purchaser at the time of the final payment.

" 7. Should a subscriber pay for this stock in full prior to Septem-

ber 1, 1933, all dividends will thereafter be paid to him at the usual dividend periods.

"8. In the event of resignation or discharge of the subscriber the Management Committee shall have the right to refund all payments made with interest at 6% and may sell the stock of the party in question as its discretion may dictate.

"9. In the event of death, the estate of the subscribing decedent may complete the payments due and sell the stock forthwith. This will give the family of the decedent the benefit of all profits accruing on the stock immediately and will not compel them to wait until September 1, 1933 to realize their gains. The estate has the option to ask the Management Committee to refund payments made, plus 6%, if the estate is unable to complete the payments; the stock to be returned to the Committee.

"10. Mr. Kaufman and Mr. Earle through this offering wish to reward loyalty and the Management Committee in apportioning allotments in the event of an oversubscription will give preference to those officers and employees who have been with the bank for the longest period of time.

"11. This offering expires at 3 o'clock on August 30, 1929 except as to those officers and employees who are at the present time on their vacation. As to them, it expires one week after their return. * * *

"This offer actually amounts to a call on Chatham stock at $144 for a period of four years which seems to the Management Committee a very low figure. Certainly four years hence Chatham stock should be selling at a level which should show a handsome profit to all who subscribe at this time. Those who subscribed to Chatham stock at $250 in 1922 have made over six hundred points profit.

"*August* 21, 1929.

"HENRY R. JOHNSTON,
"*Vice President and Cashier.*"

Thereafter, and on August 23, 1929, this plaintiff signed a paper reading as follows:

"CHATHAM PHENIX NATIONAL BANK AND TRUST COMPANY STOCK SUBSCRIPTION AGREEMENT

"*August* 23, 1929.

"*Management Committee of Chatham Phenix National Bank and Trust Company, New York City:*

"DEAR SIRS: I hereby subscribe and agree to pay for 10 shares of the new $20 par stock of Chatham Phenix National Bank and Trust Company at $144 for each share, under the terms of the offering of the stock which you are making through the kindness of

President L. G. Kaufman and Mr. E. P. Earle, as set forth in the notice dated August 21, 1929, signed by Henry R. Johnston, Vice-President and Cashier, and

" I hereby authorize the pay department of the bank to deduct from my salary for a period of four years from September 1, 1929, unless the stock is fully paid for before that date, the sum of $1.50 at each semi-monthly pay date, beginning on September 15, 1929, for each share subscribed; in other words, $3 per month per share.

" It is understood that in the event my employment with the bank is terminated either voluntarily or involuntarily before September 1, 1933, you may refund to me the payments I have made in full, plus 6% interest, whereupon my right and interest in and to the stock subscribed for shall cease.

" It is further understood, and I agree, that I shall not sell the stock subscribed for, or any part thereof, until September 1, 1933, and only then if it is fully paid for.

" I also agree to pay any interest charges on the loan or loans you negotiate to carry the stock I have subscribed for, it being understood that all dividends on the stock shall be credited to me. The first dividend will be that of the quarter commencing October 1, 1929, as the new stock is not issued until October 4, 1929. The difference between the interest and the dividends shall be paid by or to me in full at the time of the last payment due on or about September 1, 1933.

" I further agree, as a condition of this subscription, to all of the terms set down in detail in the notice of August 21, 1929, previously referred to, which is by reference made a part hereof, and in any matter or matters arising in connection with this subscription not covered therein I agree to be bound by the decision of your committee."

Under this exhibit the plaintiff paid in a total of $1,110. His employment was terminated on September 1, 1933, and he thereupon demanded the return of his $1,110. The return was refused. The plaintiff is now in a position where he has neither the stock nor the money that he paid in.

Although the stipulation submitting the case to this court for decision sets forth questions for the court's determination, those questions cannot be answered without first inquiring into the nature of the so-called agreement entered into by the plaintiff.

I find that there was never an enforcible agreement entered into between the plaintiff and the defendants. There was no mutuality. The bank was always in a position to urge that it was not able to allot any shares to the plaintiff because of the provisions of paragraph 10 of the " Offering " for the reason that preference had to be given

to officers and employees who had been with the bank for a longer period of time than the plaintiff. It was clearly within the power of the bank to allot or not to allot the shares of stock referred to in the " Offering." There is implicit throughout the " Offering " and the letter of August 23, 1929, that the committee could allot the shares of stock to any one they saw fit. There was no absolute promise to allot them to every person that subscribed. The " Offering " was more of a sales talk than a legal offer which could ripen into a contract merely by the plaintiff's acceptance. I do not consider the paper signed by the plaintiff, dated August 23, 1929, as consummating a contract upon which the plaintiff was ever liable. In the absence of such a binding obligation on the part of the offerer, there was no mutuality and, hence, there was no binding agreement. (*Topken, Loring & Schwartz, Inc.,* v. *Schwartz,* 249 N. Y. 206; *Joseph* v. *Sulzberger,* 136 App. Div. 499; *Dittenfass* v. *Horsley,* 177 id. 143; *Goodyear* v. *Koehler Sporting Goods Co.,* 159 id. 116; affd., 220 N. Y. 749; *Cary* v. *Appo,* 84 N. Y. Supp. 569.)

Furthermore, it has been held that shares of stock are " goods " within the meaning of the Personal Property Law. (*Agar* v. *Orda,* 144 Misc. 149; affd., 239 App. Div. 827; affd., 264 N. Y. 248.) Before title to such goods can pass, it is necessary that the goods be ascertained and allotted to the plaintiff. (Pers. Prop. Law, §§ 98, 100.) Here there is nothing to show that any particular shares of stock were ever ascertained or allotted to the plaintiff. Consequently, even if there had been a valid contract between the parties, there never was a transfer of title to shares of stock to the plaintiff and he, therefore, is in a position to recover for money had and received, since he received no consideration whatsoever for the payments made by him. For all that appears, there may not have been enough shares of stock by the time the plaintiff signed the paper dated August 23, 1929, because the older employees had already indicated their intention of purchasing the stock.

An additional reason why no title to any shares of stock was ever transferred to the plaintiff arises from the provisions of section 162 of the Personal Property Law, which requires a delivery of the certificate itself before title can pass. There is no such proof before me.

Whom the judgment in this action should be entered against presents a different problem. There is proof before me that although the " offer " was made ostensibly by the bank itself and by its management committee, the offer was, in fact, made by an undisclosed principal, the Chatham Phenix Corporation, which is also named as a defendant in this action. For that reason the defendants other than said corporation seek a judgment in their favor and

argue that, since that corporation was the real principal, the other defendants cannot be held liable. The defendants, however, are in error as to the applicable and well-established law. It is now well settled and the rule is supported by good sense and justice that a person dealing with an ostensible principal may hold that person liable upon all contracts and transactions had with him, even though upon the trial of the action it appears that the ostensible principal was, in fact, merely an agent. (*Ell Dee Clothing Co., Inc.*, v. *Marsh*, 247 N. Y. 392; *De Remer* v. *Brown*, 165 id. 410, 419.)

Throughout the transactions concerning these shares of stock the bank and the management committee were obviously acting as the principals. It is now too late for them to try to shift the burden from their shoulders to the Chatham Phenix Corporation alone.

I, therefore, direct that judgment be entered in favor of the plaintiff against Chatham Phenix National Bank and Trust Company, Chatham Phenix Corporation and Henry R. Johnston for the sum of $1,100, with interest.