ESTATE OF GEORGE McNAUGHT LOCKIE, DECEASED, GUARANTY TRUST COMPANY OF NEW YORK, ANCILLARY EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 32102. Promulgated October 15, 1953.

*Edgar A. Kniffin, Esq.*, and *Horace N. Taylor, Esq.*, for the petitioner.

*Clay C. Holmes, Esq.*, for the respondent.

66

OPINION.

MURDOCK, *Judge:* The Commissioner states the first issue as follows: "Should the value of a dividend in the amount of $80.00, on General Electric Co., Inc. stock, which was quoted 'ex dividend' on the date of death of the decedent, be included in the decedent's gross estate?"

The answer to that question is "No." The dividend was declared before the decedent died but was payable to stockholders of record on the day after he died. Thus, the dividend was never payable to him and he never had a right to the dividend. Cf. *Putnam's Estate* v. *Commissioner*, 324 U. S. 393. The amount of the dividend should not be included in his estate in addition to the value of his shares at the date

of his death, which value would include the right which those shares then carried to the dividend and, no doubt, would be greater than the value of other shares carrying no rights to the dividend selling "ex dividend" on the date of his death.

The Commissioner relies upon a regulation and *Estate of Merritt J. Corbett*, 12 T. C. 163, both dealing with dividends payable to stockholders of record on a date when the decedent was still alive. The fact that General Electric shares were selling "ex dividend" on the New York Stock Exchange on the day the decedent died, a fact stressed by the Commissioner, is wholly immaterial to the question here presented. Corporations sometimes declare dividends payable in the future to stockholders of record on a date subsequent to the date of declaration, as did the General Electric Company in this case. There could be misunderstanding and controversy as to whether the seller or the purchaser would receive such dividends when contracting to buy and sell after the declaration date but prior to the record date set in the declaration. Such doubt or misunderstanding is avoided by a rule or arrangement of the exchange under which it is specified that on and after a stated date all contracts relating to a particular stock on which such a dividend has been declared will exclude rights to the dividend, i. e., the seller will retain the right to the dividend and the purchaser will acquire none regardless of when the shares are registered in the name of the new owner or his nominee. The expression used to indicate that sales will not include the right to the dividend is that the stock is being sold "ex dividend" and quotations are given "ex dividend." However, such sales prices and quotations have no application here where stock with the rights to the dividend is included in the gross estate at its value on the date of death, September 20. Obviously the price at which other stock was being sold on that day "ex dividend" would not be a proper measure of the value of this stock from which the dividend rights had not been separated. The question of the value at which the General Electric shares held by the decedent on the date of his death should be or were included in his gross estate is not in issue.

The remaining issues arise because the decedent was an alien nonresident of the United States at the time of his death and personal property is not includible in his gross estate unless it had a situs in the United States at the time of his death. The parties agree that the Bank of Nova Scotia stock and the loans to the British Treasury had no *siti* in the United States unless the certificates described in the stipulation and in the Findings of Fact were "treated as being the property itself," as is the case with the ordinary certificates for stock of domestic corporations and the usual evidence of loans, or if there was in connection with them a property right issuing from or enforceable against a resident or domestic corporation of the United States.

*Burnet* v. *Brooks*, 288 U. S. 378; Regs. 105, sec. 81.50. The Commissioner makes no argument that there was in connection with the stock or the loans any property right issuing from or enforceable against a resident or domestic corporation of the United States, so the issue narrows to whether the certificates were or may be treated as being the property itself.

The Commissioner argues that the stock certificate was just like the usual certificates issued by domestic corporations, the Treasury Certificates were like bonds or notes, each was the only document issued to evidence ownership, they were treated as being the property itself, and the values of the properties are includible in the value of the gross estate since the properties had *siti* within the United States. The evidence shows clearly that he is in error with respect to the bank stock. It was "book stock," ownership of which depended upon registration and to no extent upon any certificate. The certificate in question bears no resemblance to the usual certificate for stock of a domestic corporation. There are sometimes in existence several such certificates relating to the same "book stock." They need not be turned in or destroyed when the ownership of the stock changes. They merely indicate who the registered owner of the stock was on the day stated in the certificate. No rights attach to them. They have no value and do not even indicate who owns the stock at any later date. They are never treated in any way as the property itself. The stock had a situs only in Halifax where it was registered.

The petitioner's case in regard to the war loans to the British Treasury appears to be somewhat weaker but the evidence shows, by at least a fair preponderance, that the loans also had no situs in the United States. They were the result of unusual war measures adopted by the British Government in an emergency. The borrower issued no bond or other usual evidence of the loans. The loans were strictly between the individual and the Treasury. The "Treasury Certificate" was not a security but merely an acknowledgment that the money had been advanced and would be returned when the lender demanded it. A suit would have to be in England for money loaned. The certificates bore no interest, could not be transferred or negotiated, and could not be sued upon. Each "should" be returned when repayment was demanded and was the only evidence of the transaction issued by the borrower. Nevertheless, the certificates were so unlike securities which are sometimes treated as the property itself that their mere presence here does not justify a holding that the loans had a situs in the United States.

The petitioner concedes that the decedent, at the time of his death, had property rights issuing from and enforceable against residents of the United States to buy the blocks of stock for which his broker had contracted on September 19, 1945, but argues that he was not the

owner of the stock and the contracts had no value because they required payment of money equal to or in excess of the value of the stocks. The Commissioner's argument is that title to the blocks of stocks passed to the decedent on the 19th. The evidence supports the petitioner. The blocks of stock were not bought on the 19th. The contracting brokers, following well-established rules and practices of the New York Stock Exchange, merely intended to enter into contracts on September 19, 1945, to buy and to sell the stock on September 21, 1945, upon payment, on that same day, of the purchase prices. The decedent never acquired any property rights in any shares which would make him the owner of those shares on the day he died. The property involved was fungible and unascertained. Meyer, The Law of Stock Brokers and Stock Exchanges, sec. 58; *Rogers* v. *Thomson*, 215 App. Div. 541, 545, 214 N. Y. Supp. 193; *Wills* v. *Investors' Bank Stocks Corp.*, 257 N. Y. 451, 178 N. E. 755. No property in the goods passed until they were ascertained on the delivery day of September 21, 1945. New York Personal Property Law, art. 5, secs. 98, 100, art. 6, sec. 162; Uniform Sales Act, sec. 17; *Coyne* v. *Chatham Phenix National Bank & Trust Co.*, 155 Misc. 656, 281 N. Y. Supp. 271; *Hatch* v. *Standard Oil Co. of Cleveland*, 100 U. S. 124. The decedent during his life could not sue for specific performance, but only for damage incurred, in case of default by the undisclosed seller. He never acquired voting rights. The stipulation indicates by its silence that no dividend rights were involved. The decedent was never in position to sell the shares but could have made only a short sale. The case of *Crocker, et al.* v. *Helvering*, 76 F. 2d 974, affirming 28 B. T. A. 132, certiorari denied 296 U. S. 596, referred to by the Commissioner, is not in point because it involved a direct sale of specifically ascertained shares expressly appropriated to the contract. Here the decedent's money was still in the bank and not subject to estate tax, the shares, which would represent property having an estate tax situs in the United States, still belonged to undisclosed persons, and the decedent's contracts to buy the stock had no value when he died because the then value of the shares was less than the amount he had agreed to pay for them.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

———

Van Fossan, *J.*, dissenting: I respectfully dissent from the holding of the majority that the British Treasury Certificates, issued to evidence the non-interest-bearing wartime loans by petitioner to the British Government, were not securities or property having a situs in the United States and includible as part of the gross estate of the petitioner's decedent.

On their face, these certificates each represent the unconditional obligation of the British Government *entitling* decedent to the payment of a fixed sum of money in a designated national currency upon presentation and demand. These are among the essential ingredients of an ordinary bond or debenture. I do not deem it of controlling significance that they were nontransferable and nonnegotiable. Nor do I consider as material the fact that the debt evidenced thereby could probably be collected without presentation thereof should any or all of them be lost or destroyed. Such is commonly the case where nonnegotiable registered bonds are involved. No reason has been suggested why the certificates should be considered as having any value less than the full amount of the debt of which they evidence.

In my judgment, these certificates possess sufficient attributes of the intangible property of which they are the written evidence to be treated as being the property itself. *Burnet* v. *Brooks*, 288 U. S. 378; Regs. 105, sec. 81.50. I would therefore hold that they have a taxable situs within the United States and that the value thereof, in the amount of $110,704.50, is includible in decedent's gross estate.

BLACK and TIETJENS, *JJ.*, agree with this dissent.